# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**TOMAS M. VASQUEZ,**

**Plaintiff,**

**-vs-**                                          **Case No.  6:05-cv-1914-Orl-KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant.**

_____

## ORDER

This cause came on for consideration without oral argument on the Complaint filed by Tomas M. Vasquez, seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA).  Doc. Nos. 7, 8.  Pursuant to the consent of the parties, this matter has been referred to me for disposition under 28 U.S.C. § 636(c).  Doc. Nos. 9, 10.

## I.     PROCEDURAL  HISTORY.

In December 2001, Vasquez applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq*., alleging that he became disabled on March 1, 1998.  R. 68-71.Vasquez's application was denied initially and on reconsideration. R. 59-60, 62-63.

Vasquez made a timely request for a hearing before an administrative law judge (ALJ).  R. 58.  An ALJ held a hearing on February 18, 2004. Vasquez, represented by an attorney, testified at the hearing.  No other testimony was taken.  R. 623-59.

After considering the testimony and the medical evidence presented, the ALJ determined that Vasquez was insured under OASDI through December 31, 2003.  R. 24. The ALJ found that Vasquez had not engaged in substantial gainful activity since March 1, 1998, the alleged onset date of his disability.  R. 24.

The ALJ concluded that the medical evidence showed that Vasquez had degenerative disc disease with lower back pain, adjustment (affective) disorder, and arthritis of the knees, which were severe impairments.  These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[1]  *Id.*

The ALJ found that Vasquez had the residual functional capacity (RFC) to lift and carry no more than ten pounds, with only occasional climbing, balancing, stooping, kneeling, crouching or crawling.  *Id.*  He would also be limited to employment that required only simple, unskilled tasks. *Id.*   Based on the RFC determination, the ALJ concluded that Vasquez could perform a wide range of unskilled sedentary work.[2]  R. 25.

---

[1] The Code of Federal Regulations "contains a Listing of Impairments specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567.  The ALJ did not cite any evidence upon which he

In reaching these conclusions, the ALJ gave little weight to the opinion of Steven B. Brown, M.D., one of Vasquez's treating physicians.  The ALJ noted that Dr. Brown typically recommended physiotherapy, use of a home stretch/exercise program, and current medication, and that Vazquez did not seek follow-up treatment for eight weeks, all of which the ALJ concluded was inconsistent with Vasquez's allegations of intractable pain.  R. 21.

With respect to his mental impairments, the ALJ found no limitations in the areas of social functioning and activities of daily living and no repeat episodes of decompensation.  He also concluded that there were no more than mild functional limitations in the areas of concentration, persistence, and pace.  *Id.*  The ALJ gave little weight to the opinion of Shobha Gupta, M.D., Vasquez's treating psychiatrist, because he found Dr. Gupta's conclusion that Vasquez could not work inconsistent with his conclusion that Vasquez did not have marked impairments in any area of mental functional capacity, and because Dr. Gupta's records reflect that Vasquez's condition improved after use of medication.  *Id.*

The ALJ also found that Vasquez's testimony about the limitations arising from his impairments was not totally credible because it was inconsistent with Vasquez's ability to "prepare meals, shop, do laundry, load the dishwasher, bathe, dress, visit, follow instructions, etc., with assistance."  *Id.*   The ALJ also observed that Vasquez responded well to medication.  As such, the ALJ concluded, "it is very difficult to make a cogent argument for total disability."  *Id.*

Because Vasquez's past relevant work required more than a sedentary level of exertion, the ALJ concluded that Vasquez could not return to his past relevant work.  While the ALJ recognized

---

relied to conclude that Vasquez could perform a wide range of sedentary work despite his postural and mental functional limitations.

that "strict application" of the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt P, App. 2, was inappropriate because of Vasquez's additional functional limitations, he nevertheless relied upon the Grids based on his conclusion that Vasquez's functional limitations would not be expected to preclude employment at a substantial gainful activity level.  Therefore, the ALJ concluded that Vasquez was not disabled.  R. 25.

Vasquez requested review of the ALJ's decision. R. 28-30.  He also submitted additional medical records.  R. 31-47.  The Appeals Council found no basis to review the ALJ's decision, and denied the request for review.  R. 3-9.  Vasquez then timely sought review by this Court.  Doc. No. 1.  Thereafter, the Appeals Council *sua sponte* reopened the matter to consider the additional medical records.  R. 3-9.  However, even after considering the additional records, the Appeals Council found no basis to review the ALJ's decision.  *Id*.

## II.     JURISDICTION.

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Vasquez's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. § 404.981.  Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## III.    STATEMENT OF FACTS.

*A.      Evidence from Vasquez.*

Vasquez was born July 24, 1973.  R. 629.  He is 5'10" tall and weighed 248 pounds at the time of his hearing.  R. 635-36.  He completed some high school and obtained a GED, but had not completed any subsequent education.  R. 629-30.

-4-

Vasquez previously worked as a delivery driver for United Parcel Service (UPS).  R. 630. In June 1995, Vasquez injured his back at work.  *Id.*  In 1997, he fell from his delivery truck and sustained knee injuries.  R. 631.  In March 1998, his doctors informed UPS that Vasquez could no longer perform his job duties.  *Id.*

Before UPS, Vasquez also worked as a parking attendant and manager at a parking valet company, at a button factory, at a restaurant, at a factory loading videos for delivery, and did seasonal work for a clothing store.  R. 632-35.

At the hearing, Vasquez testified that he had "consistent and sharp [pain] in the lower back, down to the buttocks, all the way down to the legs, particularly the knees and the buttocks is where the worst pain gets and the lower back radiates.  It's a radiating, sharp pain." R. 649.  The pain radiated to his feet, resulting in tingling and numbness.  R. 650.   He also had lower back muscle spasms.  R. 648.  He used an RS-1 stimulator two or three times a day to reduce the spasms.  *Id.* He also took pain medication, and he had had trigger point injections in an attempt to alleviate the pain. R. 97A[3], 649.  Vasquez ranked his daily pain as seven to nine on a ten-point scale with medication, and ten and above without medication.  R. 649; *see also* R. 97-97A, 120-21.

Vasquez estimated he could walk for no more than about five or ten minutes, even using a cane for assistance.  R. 647.  Because of knee instability, Vasquez fell three or four times a month even when using his cane.  R. 651.  He could only stand for ten to fifteen minutes.  R. 653; *see also* R. 97, 120.  Vasquez estimated that he could not sit longer than about twenty minutes.  R.

---

[3]     The record contains one page appended to page 97, designated as 97A.  Other pages intermittently contain __A pages, and even 99A – 99C.

652.  He required medication to sit for longer periods, such as when flying.  R. 653.  He could lift a ten pound bag of groceries, but no more.  *Id.*

His back and neck pain also caused headaches.  R. 651–52.  He sometimes treated the headaches with Advil, but often he had to lie down in a dark room and use an ice pack on his head.  R. 652.

Vasquez also experienced panic attacks and depression.  R. 655.  When experiencing a panic attack, he had difficulty breathing or focusing.  *Id.*  He experienced claustrophobia when around large gatherings of people.  R. 657.  He also had difficulty remembering things.  R. 98, 99A-99C.  He estimated that he had panic attacks fifteen to twenty days a month.  R. 656.

Vasquez lived in an apartment with his wife and three children.  R. 628-29.  He spent much of the day looking after his youngest daughter, who was about fifteen months old at the time of the hearing.  R. 629, 642-43.  Before leaving for work, his wife prepared everything he would need for the baby.  His wife also came home at the lunch hour to change the baby's diapers, if needed, and to prepare lunch.  R. 643.  He could make himself a sandwich, but otherwise did not cook.  R. 646.  He did not help with clean up after meals or other household chores.  *Id.*  He could bathe and care for himself, but had trouble bending to tie his shoes.  R. 647-48.

Vasquez did not read very much. R. 644.  He watched television during the day, sitting for no more than twenty minutes at a time.  R. 652.  Vasquez attended church services about twice a month.  R. 642. He social activities were otherwise limited to an occasional movie and visits from his wife's family.  R. 644, 648.  Since the alleged onset date of his disability, he had flown to New York for a family visit, but he came home early because his condition worsened.  R. 643.

Vasquez had a driver's license and could drive.  R. 641.  He could drive for up to an hour, but frequently drove less.  *Id.*  He usually only went out to buy groceries.  *Id.*  However, his wife did most of the grocery shopping.  R. 653-64.  When at the grocery store, he used the motorized carts.  R. 654.  He did not go to flea markets or shopping malls because that required too much walking.  R. 646.

Vasquez had difficulty falling and staying asleep.  R. 639-40.  He often took naps during the afternoon.  R. 640.  He estimated that, combining night sleep and naps, he got about six hours of sleep per day.  R. 641.

B.      *Medical Records.*

1.      <u>Records Regarding Physical Impairments</u>.

Steven B. Brown, M.D., a neurologist, treated Vasquez for radiating back pain and knee pain and weakness beginning sometime before December 4, 1998, through August 2005.  R. 34-47 (records presented to the Appeals Council); 136-377.   Throughout the records, Vasquez consistently complained of radiating back pain and knee pain.  *Id.*

Initially, Dr. Brown's impressions included bilateral knee derangement and lumbar myofascial syndrome,[4] with reduced range of motion.  R. 378.  He administered trigger point

---

[4]  Myofascial syndrome refers to " a chronic local or regional musculoskeletal pain disorder that may involve either a single muscle or a muscle group. The pain may be of a burning, stabbing, aching or nagging quality."   Beth Israel Medical Center, *Myofascial Pain Syndrome*, http://www.stoppain.org/pain_medicine/content/chronicpain/myofascial.asp (last visited Feb. 20, 2007).

injections for pain relief and prescribed pain medication, physical therapy,[5] and chiropractic

treatments.  He also referred Vasquez to an orthopedist to discuss whether bilateral knee

arthroscopy was appropriate.  R. 273-75; 376-80.[6]

In February and April 1999, Dr. Brown observed that Vasquez had a bulging disc at L5-S1,

R. 274, had a antalgic gait to the left, R. 273, and had meniscal tears in both knees, R. 270.

In August 1999, Dr. Brown noted that Vasquez recently underwent right knee ACL

(anterior cruciate ligament) surgery.  R. 265.  In November 1999, Dr. Brown observed that

Vasquez also underwent left knee ACL surgery in October 1999.  R. 263; *see also* R. 381-415

(surgical records).

An EMG of the back performed in February 2000 showed L5 and cervical radiculopathy.

R. 237-38.

In March 2000, Dr. Brown concluded that Vasquez had reached maximum medical

improvement.  R. 232.   Vasquez still had significant tenderness and spasms in the lumbar region,

and decreased range of motion in the lumbar spine.  R. 230.  Dr. Brown's diagnosis was lumbar

myofascial syndrome and herniated nucleus pulposus with evidence for radiculopathy.  *Id.*

Vasquez returned to Dr. Brown in May 2000, complaining of radiating back pain with

numbness and tingling in the leg, and bilateral knee pain and weakness which had somewhat

lessened since his knee surgeries.  R. 228.  Dr. Brown administered trigger point injections and

---

[5]   Vasquez completed a course of physical therapy.  R. 418-28.  These records also reflect Vasquez's continuing complaints of pain, and therapists findings of tenderness and spasms.  *Id.*

[6]  There are no pages numbered 276 through 375 in the record.

continued to prescribe pain medication and physical therapy.  He recommended a neurological

reevaluation in two months.  R. 228-29.  Dr. Brown treated Vasquez for the same symptoms in

August and October 2000.  R. 224-227.

In February 2001, Dr. Brown noted that Vasquez suffered from depression.  R. 222.Dr.

Brown opined that Vasquez "remains unable to work in either a sedentary or full labor job.  No

prolonged sitting or standing.  No lifting greater than ten pounds."  R. 223.  Dr. Brown continued

to treat Vasquez on a regular basis throughout 2001.  R. 178-222.  Throughout this time, Vasquez

consistently complained of radiating back pain, knee pain and weakness, depression, and later

panic attacks.  *Id.*  In October 2001, Vasquez also began complaining of neck and upper back pain.

R. 188.

Meanwhile, in August 2001, Vasquez was hospitalized due to severe abdominal pain,

nausea and vomiting.  R. 432-473.  He also had an intractable low back spasm.  R. 451.  On

examination, he also had a positive straight-leg raising bilaterally.[7]  R. 447.  An MRI taken during

this admission and reviewed by Seth Wachsman, M.D., showed a mild bulge at L4-5.  R. 450; *see*

*also* R. 468 (MRI report).

Ajaib Mann, M.D., and Andrew Goldberg, M.D., examined Vasquez in October 2001,

when he was again hospitalized due to abdominal pain.  R. 483. A straight-leg raising test was

_____

[7]  "'The simple straight-leg raising test is performed with the patient lying supine, with the backs of the knees flat on the examining table. The knee is held straight, and the foot of one leg is raised while the hip is slowly flexed. Flexion of the leg through a range of 60 to 90 degrees is considered to be normal. The test is positive when pain is reproduced down the posterior thigh below the knee between the angle of 30 to 70 degrees.'"  *Menezes v. Apfel*, No. CIV. 99-168-B, 2000 WL 1499491, at *1 n.7 (D.N.H. May 4, 2000) (quoting ATTORNEYS' TEXTBOOK OF MEDICINE ¶ 15.34(1) (3d ed.1999)).

positive, and he had decreased sensation in the lower extremities.  The doctors recommended a

neurosurgical consultation, among other things.  R. 485.  An MRI revealed degenerative findings

in the L5 and S1 areas of the spine.  R. 475.

In December 2001, Dr. Brown prepared an impairment questionnaire.  R. 82-88.  He

opined that Vasquez could sit for up to one or two hours, and stand for up to one hour in an eight-

hour workday.  R. 85.  He would need a sit/stand option through which he could get up and move

around every fifteen minutes, and that he would need to stand up for ten minutes before being able

to sit again.  *Id*.  Dr. Brown indicated that Vasquez could lift and carry up to five pounds.  *Id*.  He

needed to avoid heights, pushing, pulling, kneeling, bending, and stooping.  R. 88.  Dr. Brown

observed that Vasquez had undergone surgery of both knees, and opined that Vasquez's pain

would constantly interfere with his attention and concentration.  R. 86. He opined that Vasquez

would require hourly unscheduled breaks during an eight-hour work day.  R. 87.

In January 2002, Dr. Brown observed that Vasquez continued to have restricted range of

motion, and muscle spasms in the spinal area.  His impression was that Vasquez suffered from

myofascial syndrome in the cervical, thoracic, and lumbar spine.  R. 174.  In February and

September 2002, Dr. Brown administered epidural injections for pain.  R. 148, 168.  In July 2002,

Vasquez reported shoulder pain as the result of a fall.  R. 152.  In January 2003, Dr. Brown

completed another neurological examination.  His impression was cervical, thoracic, and lumbar

myofascial syndrome, and bilateral knee derangement.  R. 137.  Dr. Brown again concluded that

Vasquez had reached maximum medical improvement.  R. 138.

-10-

Dr. Brown continued to treat Vasquez on a regular basis for neck and back pain, which occasionally radiated to the shoulders and legs, bilateral knee pain and weakness, and headaches. R. 574-93.  Straight-leg raising was positive bilaterally. R. 585.  Dr. Brown observed that spinal range of motion was decreased.  R. 591. The impression was consistently cervical, thoracic and lumbar myofascial syndrome, bilateral knee derangement, and depression.  R. 585.  In January 2004, Dr. Brown indicated that an MRI showed a herniated disc at L5-S1.  R. 612.

2.      Records Regarding Mental Impairments.

In July 2001, Debra Tantillo, L.C.S.W. (licensed clinical social worker), examined Vasquez as the request of Dr. Brown.  R. 75-81, 429-31.  She prepared a psychiatric impairment questionnaire, in which she diagnosed Vasquez has having adjustment disorder with mixed anxiety and depressed mood.  R. 75.  She observed appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, emotional lability, recurrent panic attacks, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, feelings of guilt/worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, blunt, flat, or inappropriate affect, decreased energy, intrusive recollections of a traumatic experience, and generalized persistent anxiety, as well as irregular eating and sleeping patterns and social withdrawal.  R. 76.  She observed that Vasquez reported having been hospitalized for psychiatric symptoms.  R. 77.  Accordingly, Tantillo concluded that Vasquez would have moderate limitations in the ability to make simple work related decisions, marked limitations in the ability to complete a normal workweek without interruptions from psychologically based symptoms, mild limitations in the ability to travel to unfamiliar places, and no limitations on social interactions, the ability to be

-11-

aware of normal hazards, or set realistic goals.  R. 78-79.   She also indicated that Vasquez would experience episodes of decompensation arising from depression and panic attacks.  R. 79.  She estimated Vasquez's Global Assessment of Functioning (GAF) to be 60.[8]  R. 75.  Tantillo recommended individual weekly psychotherapy, and a referral to a psychiatrist.  R. 431.

Shobha Gupta, M.D., a psychiatrist, began treating Vasquez some time before January 31, 2002.  R. 524.  Dr. Gupta's handwritten records are largely illegible.  R. 498-523, 600-09. Nevertheless, it is apparent that Dr. Gupta consistently observed depressed and sad mood, anxiety, decreased concentration, feelings of hopelessness and worthlessness, irritability, paranoia, and other symptoms, which he treated with a variety of medications.  *Id.*  In March, September, and October 2002, Dr. Gupta observed that Vasquez had experienced particularly bad panic attacks. R. 509, 512, 517.  In May 2002, he observed that Vasquez experienced difficulty dealing with large gatherings of people, and with changing his routine.  R. 514.

In February 2002, Vasquez was seen by Luis R. Zaldivar, Ph.D., a clinical psychologist.  R. 541-43.  After a clinical interview including some mental status tests, Dr. Zaldivar concluded that Vasquez's  symptoms appeared to be consistent with the diagnosis of (309.28) Adjustment

---

[8]   The GAF scale is used to report an individual's overall level of functioning. A rating of 60 reflects:

> Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or coworkers).

HAROLD I. KAPLAN, M.D. & BENJAMIN J. SADOCK, M.D., SYNOPSIS OF PSYCHIATRY 299 (8th ed. 1998) (SYNOPSIS OF PSYCHIATRY).

Disorder with Mixed Anxiety and Depressed Mood.[9]  He indicated that continued psychiatric

treatment appeared to be indicated.  R. 543.

      In April 2002, Dr. Gupta, prepared a psychiatric/psychological impairment questionnaire.

R. 89-96.  Based on weekly treatments of Vasquez from February 2002, through the date of the

questionnaire, Dr. Gupta opined that Vasquez suffered from severe major depression, panic

attacks, and memory lapses.  R. 89.  Dr. Gupta also observed that Vasquez's highest GAF score

over the last year was 35, and that his then current GAF was 30.[10]  R. 89.  The prognosis was poor.

R. 89.

      Dr. Gupta cited the following clinical findings in support of his opinion: Vasquez had poor

memory, appetite disturbances with weight change, sleep disturbance, personality change, mood

---

[9]  "309.28" refers to the code for adjustment disorder in the Diagnostic and Statistical Manual
of Mental Disorders, 4th edition.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS
– FOURTH EDITION 624 (4th ed. 1994).

[10]  A rating of 21-30 reflects:

      Behavior is considerably influenced by delusions of hallucinations OR serious
impairment in communication or judgment (eg, sometimes incoherent, acts grossly
inappropriately, suicidal preoccupation) OR inability to function in almost all areas
(eg, stays in bed all day; no job, home, or friends).

A rating between 31-40 reflects:

      Some impairment of reality testing or communication (eg, speech is at times
illogical, obscure, or irrelevant) OR major impairment in several areas, such as work
or school, family relations, judgment thinking, or mood (eg, depressed man avoids
friends, neglects family, and is unable to work; child frequently beats up younger
children, is defiant at home, and is failing at school).

SYNOPSIS OF PSYCHIATRY 299.

-13-

disturbance, emotional lability, delusions or visual hallucinations, substance dependence, recurrent panic attacks, pervasive loss of interests, psychomotor agitation or retardation, paranoia, feeling of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideations, oddities of thought, time and place disturbances at times, social withdrawal, blunt, flat or inappropriate affect, decreased energy, obsessions, intrusive recollections of a traumatic experience, persistent irrational fears, generalized persistent anxiety, pain unexplained by organic disturbance, and hostility.  R. 90.

Dr. Gupta opined that Vasquez would experience moderate limitations in the ability to do the following:  remember locations and work-like procedures; understand, remember and carry simple or detailed instructions; to perform within a schedule; sustain an ordinary routine without supervision; work in proximity to others without being distracted; make simple work-related decisions; complete a normal workweek without interruptions from psychologically based symptoms; interact with the general public; ask simple questions; accept instructions and respond to criticism from supervisors; get along with coworkers; maintain socially appropriate behavior; travel to unfamiliar locations; and set realistic goals.  R. 92-94.  He also opined that Vasquez would have marked limitations on his ability to do the following:  maintain concentration for extended periods; respond to changes in the work place; and, be aware of, and respond to, hazards. *Id*.  He opined that Vasquez could not work, and could not cope.  R. 94-95.  He opined that Vasquez was incapable of dealing with even low stress because of pain and anxiety.  R. 95.  He estimated that Vasquez would be absent from work more than three times per month.  R. 96.

In May 2003, Dr. Gupta observed that Vasquez was depressed, and his diagnoses were major depression, panic disorder, and generalized anxiety disorder.  He continued to prescribe medication and psychotherapy.  R. 498.

Medical records from Dr. Gupta from June 2003 through January 2004 are also largely illegible.  R. 600-09.  Nevertheless, they indicate that Vasquez continued to suffer from depression and anxiety.  Dr. Gupta indicated that Vasquez had a particularly difficult time when he flew to New York.  R. 606.

In February 2004, Dr. Gupta prepared another psychiatric/psychological impairment questionnaire, in which he diagnosed Vasquez with depressive disorder and anxiety disorder.  R. 594.  Vasquez's then current GAF was 28, and it had not been higher than 30 throughout the year. *Id*.  Dr. Gupta indicated substantially all of the same findings, such as appetite disturbance with weight change, sleep disturbance, etc., as his April 2002 questionnaire.  *Compare* R. 595 *with* R. 90.  However, Dr. Gupta indicated that Vasquez no longer demonstrated poor memory, visual hallucinations, suicidal ideation, time or place disorientation, obsessions with pain, or oddities of thought. R. 595.  He indicated that Vasquez would have moderate limitations in ability to do the following: remember locations and procedures;  understand and remember simple and detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; make simple work related decisions; complete a normal workweek without interruptions due to psychological factors; interact with the general public; and, respond to changes in the workplace.  Dr. Gupta opined that Vasquez would have mild limitations in the ability to do the following:  carry out simple instructions; ask simple questions; accept instructions; get along with

-15-

coworkers; and, maintain socially appropriate behavior.  R. 597-98.  Dr. Gupta concluded that

Vasquez was unable to work because of his anxiety and depression.  R. 599.

> C.    *Reviewing Professionals.*

> 1.    <u>Records Regarding Physical Impairments</u>.

In February 2002, J. Andriole, D.O., prepared an RFC assessment.  R. 544-51.  He

indicated that Vasquez could occasionally lift up to twenty pounds and frequently lift up to ten

pounds, could stand, walk, and sit for about six hours in an eight-hour workday, and would have

limited pushing and pulling in his lower left extremity.  R. 545.  Vasquez would have occasional

limitations in climbing, balancing, stooping, kneeling, crouching, and crawling due to back pain,

and would have no manipulative, visual, communicative, or environmental limitations.  R. 547-48.

Another RFC assessment prepared in August 2002 by someone whose name is illegible

concluded that Vasquez could occasionally lift up to fifty pounds, frequently lift up to twenty-five

pounds, and stand, walk, and sit for about six hours in an eight-hour workday.  R. 553.  The

reviewer concluded Vasquez would have no postural, manipulative, visual, communicative, or

environmental limitations R. 554-56.

> 2.    <u>Records Regarding Mental Impairments</u>.

In March 2002, Susan H. Shapiro, Ph.D., prepared a Psychiatric Review Technique form

based on a review of Vasquez's records.  R. 527-40.  She concluded that Vasquez had an affective

disorder, but that it was not severe.  R. 527.  The adjustive disorder was related to his pervasive

loss of interest in almost all activities.  R. 530.  She concluded that he would experience no

functional limitations associated with mental problems.  R. 537.

-16-

In August 2002, David L. Kirk, Ph.D., prepared a Psychiatric Review Technique form.  R. 560-73.  Dr. Kirk concluded that Vasquez had an affective disorder, which was not severe.  R. 560.  He concluded that Vasquez would have mild limitations in maintaining concentration, persistence, and pace, and no other limitations.  R. 570.  He also concluded that Vasquez was only mildly depressed.  R. 572.

## IV.     STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  In a case under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979) (per curiam).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

(1) Is the claimant presently unemployed?

(2) Is the claimant's impairment severe?

-17-

(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

(4) Is the claimant unable to perform his or her former occupation?

(5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision.  *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment.  *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).  Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law.  *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

 When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

## V.    ANALYSIS.

Vasquez asserts three grounds supporting reversal: (1) that the ALJ should have obtained vocational expert (VE) testimony; (2) that the ALJ improperly rejected evidence from his treating

physicians; and (3) that the ALJ improperly analyzed Vasquez's credibility.[11]  Because I find the

first issue dispositive, it is the only issue I will address in detail.

> A.      *Need for a VE at Step Five of the Sequential Evaluation Process.*

Before the Grids were promulgated in 1979, the preferred method of determining whether

there was work available that a social security claimant could perform was through the testimony

of a VE.  *See Cowart v. Schweiker*, 662 F.2d 731, 736 (11th Cir. 1981).  After the United States

Supreme Court approved use of the Grids in appropriate cases, *see Heckler v. Campbell*, 465 U.S.

458 (1983), three-judge panels in the Eleventh Circuit began to address whether the Grids could be

relied upon at step five of the sequential evaluation process when the claimant had non-exertional

impairments that limited his work skills.

The law that developed in this circuit requires that the ALJ initially determine whether the

claimant's alleged non-exertional impairments limit the ability to work; if they do not, then

exclusive reliance on the Grids at step five of the evaluation process is appropriate. *See Reeves v.*

*Heckler*, 734 F.2d 519 (11th Cir. 1984)(citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d

524, 537 (6th Cir. 1981); *see also Broz v. Schweiker*, 677 F.2d 1351, 1363 (11th Cir.

1982)(remanding for consideration whether a claimant's non-exertional impairments significantly

limited his basic work skills, and then, whether the Grids could be used), *vacated, Heckler v. Broz*,

461 U.S. 952 (1983), *adhered to on remand*, *Broz v. Schweiker*, 711 F.2d 957 (11th Cir.), *modified*

*in other respects*, 721 F.2d 1292 (11th Cir. 1983).  However, if the ALJ finds that the claimant's

non-exertional impairments significantly limit the claimant's basic work skills, otherwise stated as

---

[11]  The parties were advised that issues not specifically raised would be waived.  Doc. No. 11
at 2.

precluding the wide range of work at a given exertional level, then exclusive reliance on the Grids is not permitted. *See Phillips v. Barnhart*, 357 F.3d 1232, 1242 (11th Cir. 2004) (citing *Francis v. Heckler*, 749 F.2d 1562, 1566 (11th Cir. 1985)). Rather, the ALJ must turn to VE testimony regarding the specific jobs that the claimant can perform in light of the claimant's functional capacity. *See id.* at 1243; *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992); *Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Welch v. Bowen*, 854 F.2d 436, 439-40 (11th Cir. 1988) (per curiam); *Gibson v. Heckler*, 762 F.2d 1516, 1521-22 (11th Cir. 1985).

When an ALJ finds that non-exertional impairments limit work activity, but do not preclude a wide range of work, "the ALJ must 'articulate specific jobs that exist and that the claimant is capable of performing,'" *Welch*, 854 F.2d at 439-40. This finding must be supported by substantial evidence, *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995) (per curiam), and can be drawn from suitable sources such as the *Dictionary of Occupational Titles* or from the testimony of a VE, *Welch*, 854 F.2d at 439-40.

"Exertional limitations affect an individual's ability to meet the seven strength demands of the job: sitting, standing, walking, lifting, carrying, pushing, and pulling. . . . Non-exertional limitations or restrictions affect an individual's ability to meet the other demands of jobs and include mental limitations, pain limitations, and all physical limitations that are not included in the seven strength demands." *Johnson v. Barnhart*, No. 02-16464, 2003 WL 22595220, at * 4 (11th Cir. May 22, 2003) (per curiam) (citing Soc. Sec. Rul. 96-4). In the present case, the ALJ found that Vasquez had non-exertional postural limitations that limited his ability to climb, balance, stoop, kneel, crouch and crawl, and that required that he perform only simple, unskilled tasks.

The ALJ acknowledged that strict application of the Grids was not possible because Vasquez had functional limitations that narrowed the range of work he could perform. R. 25. Nevertheless, the ALJ did not cite to any evidence supporting his conclusion that Vasquez could perform a wide range of unskilled sedentary work despite his non-exertional limitations. He also did not identify any specific jobs that Vasquez could perform despite his non-exertional limitations. Accordingly, substantial evidence does not exist in the present record to support the ALJ's conclusion that there were unskilled sedentary jobs available in the national economy that Vasquez could perform in light of his exertional and non-exertional functional limitations.

B.      *Opinions of Treating Physicians and Credibility.*

Vasquez also contends that the ALJ erred by rejecting the functional capacity assessments made by Dr. Brown and Dr. Gupta, his treating physicians, and by finding his own testimony about the functional limitations arising from pain and other subjective symptoms to be not entirely credible.

In this circuit, the opinion of a treating physician must be "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2)). Moreover, the ALJ must articulate the reasons for giving less weight to the opinion of the treating physician. *Id.* While an ALJ may disregard a treating physician's opinion that a claimant is disabled, *see* 20 C.F.R. § 404.1527(e)(1), the ALJ must articulate reasons for giving less weight to the functional capacity assessments of a treating physician. *Lewis*, 125 F.3d at 1440.

-22-

In the present case, the ALJ did not specifically acknowledge in his decision that Dr. Brown made a functional capacity assessment of Vasquez.  The ALJ stated that he found Dr. Brown's treatment of Vasquez inconsistent with intractable pain, but he offered no explanation of why he concluded that Dr. Brown's opinion that Vasquez would require jobs with a sit/stand option was not adopted.

Similarly, the ALJ rejected Dr. Gupta's 2002 functional capacity assessment because it was made before Dr. Gupta began treating Vasquez with medication.  The ALJ did not specifically acknowledge the functional capacity assessment Dr. Gupta rendered nearly two years later, in February 2004, which was well after the effects of medication were known to Dr. Gupta.  He opined, merely, that he rejected Dr. Gupta's conclusion that Vasquez was disabled because it was inconsistent with Dr. Gupta's treatment records.   For this Court adequately to review that decision, more than this conclusory statement is necessary to support the ALJ's opinion.  *Cf. Owens v. Heckler*, 748 F.2d 1511, 1514 (11th Cir. 1984)("A clear articulation of both fact and law is essential to our ability to conduct a review that is both limited and meaningful.").

With respect to the conclusion that Vasquez's complaints of functional limitations were not totally credible, the ALJ cited only to Vasquez's activities of daily living. This circuit has recognized that participation in everyday activities of short duration is not necessarily indicative of an ability to perform substantial gainful activity on a sustained basis.  *See Lewis*, 125 F.3d at 1441. Furthermore, in the present case, Vasquez's testimony about his activities of daily living is consistent with Dr. Brown's RFC assessment with respect to Vasquez's inability to sit for long periods of time and restrictions on lifting.

-23-

Accordingly, on remand, the Commissioner should revisit the weight given to Vasquez's treating physicians and reassess his credibility consistently with the governing law in this circuit.

C.      *Award of Benefits or Remand.*

Vasquez requests that the Court order the Commissioner to pay him disability benefits. A court may order an award of benefits "where the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt." *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord Lewis*, 125 F.3d at 1441. Here, the record does not establish disability without any doubt. Rather, remand is required to permit the Commissioner to reassess the opinions of Vasquez's doctors, to reevaluate Vasquez's credibility, and to obtain evidence sufficient to support a finding at step five of the sequential evaluation process.

**VI.      CONCLUSION.**

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** under sentence four of 42 U.S.C. § 405(g) for further proceedings. The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on February 20, 2007.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties